318 F.2d 95
 The CONGRESS OF RACIAL EQUALITY, John Doe and Mary Doe, Appellants,
v.
C. H. DOUGLAS, individually and as Mayor of the City of
McComb City, Mississippi, and Mr. and Mrs. Aubrey
McGehee, Appellees.
 No. 19724.
 United States Court of Appeals Fifth Circuit.
 May 15, 1963.
 
 Derrick A. Bell, Jr., Carl Rachlin, New York City, Lolis Elie, New Orleans, La., Stephen C. Vladeck, Robert Emmett Burns, Norman Dorsen, New York City, Robert Collins, Nils Douglas, New Orleans, La., of counsel, for appellants.
 Peter M. Stockett, Jr., Sp. Asst. Atty. Gen. of Mississippi, Jackson, Miss., Charles Clark, Asst. Atty. Gen. of Mississippi, Jackson, Miss., William A. Wiltshire, McComb, Miss., Joe T. Patterson, Atty. Gen. of Mississippi, Dugas Shands, Asst. Atty. Gen. of Mississippi, Louis Alford, McComb, Miss., of counsel, for appellees.
 Before TUTTLE, Chief Judge, and WISDOM and GEWIN, Circuit Judges.
 TUTTLE, Chief Judge.
 
 
 1
 This is an appeal from a preliminary injunction obtained by the Mayor, acting individually and as Mayor of the City of McComb City, Mississippi, and Mr. and Mrs. Aubrey McGehee, the owners of a restaurant in a Greyhound Bus Station against CORE forbidding the defendant from sponsoring, encouraging or financing persons to utilize the terminal facilities in the City of McComb City, Mississippi, 'for the purpose of fomenting violence or provoking breaches of the peace in or near said terminal facilities; or for such purpose after having publicized their purposes and intentions to so utilize or misuse such facilities; or for the purpose of creating or securing unto themselves notoriety and publicity, as the sponsoring organization of such fomentation and provocation; or for the purpose of testing the tempers and reactions of the local citizens of the said City in the absence of local police protection.'
 
 
 2
 Jurisdiction was vested in the district court by way of 28 U.S.C. 1332, diversity of citizenship, the Congress of Racial Equality being incorporated in the state of New York, and all plaintiffs being citizens of the state of Mississippi.
 
 
 3
 On Monday, November 27, 1961, a preliminary injunction was issued by a statutory three-judge court in the Southern District of Mississippi generally enjoining McComb City and its officials from interfering in any way with compliance by the Greyhound Corporation with the laws of the United States and the regulations of the Interstate Commerce Commission prohibiting racial discrimination in interstate commerce facilities. 6 Race Relations Law Reporter 1169.
 
 
 4
 All of the evidence in this case comes from the testimony of the witnesses for the plaintiffs, including a member of CORE, on direct and cross examination, the defendants not filing responsive pleadings other than motions to dismiss nor offering any of its own witnesses.
 
 
 5
 Since this is an appeal from a preliminary injunction, and not a final ruling after full hearing on the merits, we must review the district court's injunction on the narrow question of whether that court abused or improvidently exercised its discretion. Alabama v. United States, 279 U.S. 229, 230, 49 S.Ct. 266, 73 L.Ed. 675 (1929); Weiner v. National Tinsel Manufacturing Co., 123 F.2d 96 (7th Cir., 1941). Unless the plaintiffs make out a prima facie case, a preliminary injunction should not issue. W. A. Mack, Inc. v. General Motors, Inc., 260 F.2d 886 (7th Cir. 1958). An injunction should only be used when it is clear that the question presented by the litigant who seeks the injunction is free from doubt. See Consolidated Canal Co. v. Mesa Canal Co., 177 U.S. 296, 302, 20 S.Ct. 628, 44 L.Ed. 777 (1900); St. Louis Street Flushing Machine Co. v. Sanitary Street Flushing Machine Co., 161 F. 725, 728 (8th Cir. 1908). Furthermore, there must be a balancing of the conveniences and rights of the parties and a balancing of the possible injuries to them according to how they may be affected by the granting or withholding of the injunction. Meccano, Ltd., v. John Wanamaker, New York,253 U.S. 136, 141, 40 S.Ct. 463, 64 L.Ed. 822 (1920).
 
 
 6
 The complaint,[1] the tenor of which is conveyed by the language of the preliminary injunction, stated above, claims that such 'incidents of violence' which were done in order 'to foment violence and to provoke breaches of the peace in and around terminals and facilities' have caused 'great injury and damage' to the plaintiffs.
 
 
 7
 We will examine the evidence, including the inferences to be drawn therefrom, in the light most favorable to the appellees, the winning parties below, in order to determine if the rights of the plaintiffs are clear so that this court in reviewing the issuance of the preliminary injunction of the district judge could not say that the district judge abused his discretion.[2]
 
 
 8
 The testimony discloses the following events: On Tuesday, the day following the issuance of the order of the United States District Court desegregating the terminal facilities of McComb, certain officials of McComb learned that Negro members of CORE were coming from New Orleans to McComb on Wednesday, the next day, in order to use McComb's bus terminal facilities.[3] The members arrived by bus from New Orleans Wednesday morning, as scheduled, but they found the bus terminal closed because of a 'gas leak.' Their arrival had been announced by various news media, and small groups of whites and Negroes, as well as a few members of the press, were on hand to 'greet' the travelers. They arrived at and departed the closed terminal without incident. Members of the McComb police force were present that morning. That afternoon the same CORE members returned to the terminal, but when they got there none of the McComb police force had yet arrived.[4] The crowd was larger this time. A photographer was reported to have been beaten up at or near the terminal by members of the white throng. The number of persons 'greeting' the travelers was never determined, but it was clear that the CORE groups never numbered over five. The CORE party went into that part of the terminal restaurant, which was formerly only for whites, and asked to be served. The proprietor, who first told them to go to the other part of the waiting room to be served by a woman of their color, testified that they demanded service and that one of them beat on the counter and said 'Why in the hell can't we get service in here.' He further testified that violence broke out, although he said he did not know where it came from. One of McComb's Selectmen, a Mr. Gordon, testified that he saw disturbances on Wednesday, but he too could not be specific. He said there were no breaches of the peace, and no refusal by the McComb citizens to obey the police officers, once they got there, although he said the Negroes were 'ejected' from the waiting room. He said the Negroes always behaved in an appropriate manner.
 
 
 9
 Another visit by these CORE members was planned for Friday. The newspapers carried the story on Thursday. Large crowds were again there to meet them, as well as the police force being on hand. They arrived as scheduled and used the terminal facilities without incident. The McComb Chief of Police testified that to his knowledge the CORE members did not behave in a boisterous manner.
 
 
 10
 On Saturday another visit was scheduled and again there were some greeters at the terminal site, this time not as many as on the previous visits. The reporters and police officers were also on hand. A police officer, Smith, testified that the CORE members behaved 'in a reasonably quiet manner,' and that the police had the situation under control Friday and Saturday, but that they were needed there to keep order. There were two reported incidents of disturbance on Saturday. A local member of CORE stated that he was struck several times by some person in the terminal; and the other was that two or three of the members of the crowd struck the local CORE official's car, but this stopped at the command of one of the police officers.
 
 
 11
 It was clear that the rides were publicized, but there is little evidence to indicate how the press got hold of the planned trips. One of the local CORE officials said that he knew of no planned publicity. The city officials originally learned on Tuesday of the first trip from an agent of the F.B.I., although how the latter learned is not disclosed. There is no evidence that CORE itself held press conferences to make public statements about the timing of planned rides.
 
 
 12
 From the three visits on Wednesday, Friday and Saturday, and the above described events, the testimony was that the city was affected in the following manner: Selectman Gordon: 'The people of the city were obviously greatly disturbed. They were reluctant to go about their ordinary business. The situation was extremely tense, explosive.' But he said the situation got better after Judge Mize's temporary restraining order. The proprietor of the restaurant said he had to close down his restaurant because of the tense situation, although Negroes have used the terminal facilities peacefully and without incident since the CORE visits.
 
 
 13
 The evidence relative to the conduct of the CORE members was almost entirely favorable. They behaved in an 'appropriate manner,' never 'antagonistic,' never 'boisterous,' and in 'a reasonably quiet manner' according to the testimony of three of the plaintiff's witnesses. Only the proprietor of the restaurant said one CORE member demanded service in a loud manner and beat on the counter. The only incidents of malevolent behavior came from the white crowd milling around the terminal. The police officers testified that the crowds obeyed their orders at all times and that they had the situation under control on Friday and Saturday.
 
 
 14
 The district court found that the CORE members publicized their arrival, and that this was a 'widely advertised challenge to the entire community;' that this was with the avowed purpose of testing and provoking the tempers of the community, and to incite disturbances and violence upon themselves, and to taunt and tantalize the community. The court found that their acts were done to provoke others to attack them and to commit breaches of the peace; that these acts were done only for the purpose of disturbing the domestic tranquility of the community for the financial gain of the defendants. The court then concluded that the right of the Negroes to freely use the terminal was not at issue. But that right 'to use and enjoy these facilities carries with it a corresponding duty to behave themselves while doing so. Even the well-recognized constitutional right of free speech does not accord an irresponsible person the right to wrongfully holler 'Fire' in a crowded theatre.'
 
 
 15
 We find upon a close study of all the testimony that the record is completely barren of any evidence of an intent by CORE to provoke breaches of the peace, to incite violence, to disturb the domestic tranquility for CORE's own financial gain, to bring violence upon themselves, or to taunt and tantalize the community. In fact, with the exception of the one incident of demanding service by beating on the counter, the testimony disclosed that the Negroes acted in no way hostile, violent or provoking. At all times they behaved in an orderly fashion. Furthermore, there is absolutely no evidence that CORE 'widely advertised' its goings and comings. In any event, regardless of what the findings were with respect to the publicity, it is clear that, whatever part of the injunction is based on 'advertising' of the comings and goings of CORE, the injunction must be struck down. The publicity, even if provided originally by CORE, could only be said to be a part of their peaceful efforts to demonstrate. Any violence from the local citizenry which comes from this can only be said to be based on the offensiveness to them of CORE's intention to use McComb's facilities on an integrated basis, and their right to publicize their intentions is no less protected than their carrying them out.
 
 
 16
 Of course, no court may enjoin conduct which is neither threatened nor imminent. Since there was absolutely no proof that the respondent threatened to do anything 'for the purpose of fomenting violence or provoking breaches of the peace,' or 'for such purpose after having publicized their purposes and intentions to so utilize or misuse such facilities; or for the purpose of creating or securing unto themselves notoriety and publicity, as the sponsoring organization of such fomentation and provocation,' the fact that the court issued its injunction in these terms must amount to a determination by it that the acts proven to have been threatened justified the issuance of the injunction. The record is clear that the acts proven to have been threatened constituted nothing more than a purpose by CORE to continue to test the previously segregated facilities of the bus station in a peaceful manner.
 
 
 17
 The Supreme Court has recently spoken in a case which clearly controls the one here before us. In Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, the Court reversed the Supreme Court of South Carolina's upholding of the convictions of the common law crime of breach of the peace of 187 Negro students who marched on the South Carolina State House grounds 'to submit a protest to the citizens of South Carolina * * * our feelings and our dissatisfaction with the present conditions of discriminatory actions against Negroes, in general, and to let them know that we were dissatisfied and that we would like for the laws which prohibited Negro privileges in this State to be removed.' The Negroes marched in small groups through the State Capitol, each group bearing placards of protest, such as 'I am proud to be a Negro,' and 'Down with segregation.' The Negroes were warned by the waiting police officers that they would be arrested if they did not disperse within 15 minutes of the order.[5] Instead of dispersing they sang, clapped their hands and stamped their feet, and listened to a 'religious harangue' by one of their leaders. There was testimony that a' dangerous situation was building up' and there was an 'imminently threatened disturbance of the peace of the community.' A large crowd of white persons had gathered, estimated to be about 300, which had begun to impede vehicular and pedestrian traffic.
 
 
 18
 In spite of the testimony that the city officials felt that the mob had reached a 'fever pitch' and that the demonstrations 'tended directly to immediate violence,' the Court, upon an 'independent examination of the whole record,' found that the petitioners had 'peaceably expressed their grievances' and 'peaceably assembled,'[6] and that 'South Carolina (had) infringed the petitioners' constitutionally protected rights of free speech, free assembly, and freedom to petition for redress of their grievances.' See also Fields v. South Carolina, 372 U.S. 522, 83 S.Ct. 887, 9 L.Ed.2d 965.
 
 
 19
 Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267, is the case heavily relied on by South Carolina in the Edwards case and appellees in the case at bar. We find that the facts of this case fit squarely within the factual bounds of the Edwards case and fall outside the allowable limitations on First Amendment rights as evidenced in the Feiner case.
 
 
 20
 These cases, and similar others, involve a balancing of First Amendment-- Fourteenth Amendment rights[7] with 'the power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents.' Thornhill v. Alabama, 310 U.S. 88, 105, 60 S.Ct. 736, 745 84 L.Ed. 1093 (1940). 'It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace.' Feiner v. New York, supra at 321 of 340 U.S., at 306 of 71 S.Ct. The Court there upheld the conviction of Feiner for breach of the peace for attempting to arouse the Negro people against the whites, urging that they rise up in arms and fight for equal rights. The outstanding difference between this and the Edwards case on the one hand and the Feiner case on the other is that the element in the latter case of the defendant's purpose and attempts to incite, and near success thereto, was totally lacking in this and the Edwards case.
 
 
 21
 In view of the facts and circumstances in this case the language of the Supreme Court in Terminello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131, is appropriate:
 
 
 22
 'Accordingly, a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettled effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, * * * is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'
 
 
 23
 The posture of this case in particular is even more favorable to the defendants than was the Edwards case to the defendants therein, in that an injunction is involved here which prohibits the exercise of constitutionally guaranteed rights. It is a prior restraint. As the Court said in Kunz v. New York, 340 U.S. 290, 295, 71 S.Ct. 312, 315, 95 L.Ed. 280, 'We are here concerned with suppression-- not punishment,' and so are we here in this case. Although the protection against previous restraints on the liberties guaranteed by the First Amendment is not unlimited, it takes on an even more guarded protection than punishment after the exercise thereof. See Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Kunz v. New York, supra; Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1433; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213. We find that the injunction below is an unconstitutional abridgement of the First Amendment rights, as protected by the Fourteenth Amendment, as a prior restraint on the freedom of speech.
 
 
 24
 There was no 'clear and present danger'[8] in the case at bar as there was in Feiner v. New York, supra. The testimony of both the Chief of Police and one of his officers was that at all times they had the crowd under control. The discontent and unrest of the local populace resulting from the unpopularity of racial integration or the offensiveness to them of Negroes organized in a movement to test out the segregation in the bus terminal, are no grounds to prohibit what otherwise would be a constitutionally guaranteed right and freedom, especially in the manner in which the defendants conducted themselves. 'A State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions.' Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 905.
 
 
 25
 Nor can it be said that the injunction should stand since it does not prohibit the peaceful use of the terminal but only that use for the purpose of 'fomenting violence' in McComb, for the injunction must rest on the record made in the case; and we have already held, supra, that the findings of fact by the district court dealing with an intent to foment violence are clearly erroneous and are unsupported by any evidence. The injunction, if allowed to stand, would amount to a complete deterrent to the members of CORE to demonstrate peacefully against the segregation policies of the City of McComb. CORE and other organizations, organized for the purpose of peacefully demonstrating and speaking against unconstitutional state and local laws enforcing segregation, would then find themselves virtually inarticulate. These fundamental rights to speak, assemble, seek redress of grievances and demonstrate peacefully in pursuance thereto cannot be abridged merely because a riot might be threatened to be staged or that the police officers are afraid that breaches of the peace will occur if these rights are exercised.[9]
 
 
 26
 The grant of the preliminary injunction was a clear abuse of the discretion of the trial court. The case is therefore remanded with directions to the trial court to vacate and set aside the preliminary injunction.
 
 
 27
 Judgment is reversed.
 
 
 28
 GEWIN, Circuit Judge (dissenting).
 
 
 29
 This case emphasizes the wisdom of the rule that an appellate court should exercise careful and cautious restraint before substituting its judgment for that of a resident trial judge when the judgment under review relates more to the facts proven and the demeanor of the litigants and witnesses, rather than to abstract principles of law. Before stating my reasons for this dissent, I wish to make a general observation by way of preface or preamble.
 
 
 30
 Nothing said herein is intended to lend comfort or encouragement to those who advocate the use of, or who use brass knuckles and other forms of violence; or to those who undertake deliberately to provoke others to breach the peace or create violence. Troublemakers do not solve problems. They thrive on trouble and its consequent publicity, confusion, provocation, unrest, condemnation, taunting and jeering behavior. Periods of drastic change call for magnanimous, patient and restrained conduct on the part of all elements of society, especially those who claim to be leaders. It is time for people to realize that a court is not a sovereign alchemist that can transmute violence, hate, distrust, fear, evil intent and prejudice into a rule of right conduct. People must do that themselves with encouragement and aid from the Judiciary.
 
 
 31
 The number of cases which come before the courts for review are but a handful compared with the numerous contacts and relationships which must take place from day to day amongst people with differing views and conflicting concepts. Minds that are motivated by hatred and evil motives become the repositories of wrongs and the generators of ill-mannered and shameful conduct resulting in obloquy, spoliation and hideous sufferings. There has never been a better time than now for people of different origins, backgrounds and beliefs to look for and emphasize the good qualities in others; and if they refuse to do so, the poisonous infection which will result inevitably is likely to endure for generations. The human mind that is seized and saturated with hatred rarely ever wishes to part with it.
 
 
 32
 In reversing the lower court, it seems to me that the majority has failed to give proper consideration to two fundamental principles of law which are controlling and recognized by all appellate courts. These principles are:
 
 
 33
 1. Broad discretion is lodged in trial courts in the matter of issuing temporary restraining orders and preliminary injunctions. The majority has denied any discretion to the District Court and has erroneously, in my judgment, concluded that there was an abuse of discretion. It is a well established principle of law that the trial court who is present where the trouble arises, who sees and hears the witnesses, and who can sense 'the feel' of the situation is far better qualified to decide such questions than an appellate court upon review of a cold record. Howard Hay Foundation v. Safety Harbor Sanatorium, 5 Cir., 1944, 145 F.2d 661; Burton v. Matanuska, 9 Cir., 1957, 244 F.2d 647; Jimenez v. Barber, 9 Cir., 1958, 252 F.2d 550; Joseph Bancroft and Sons Co. v. Shelley Knitting Mills, Inc., 3 Cir., 1959, 268 F.2d 569.
 
 
 34
 2. Finding of fact by the trial court are presumed to be correct and will not be set aside unless clearly erroneous. Without indulging any presumption whatever in favor of the trial court, the majority has substituted its judgment of the witnesses and the facts for the judgment of the trial court. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, 1273 (1955); Peurifoy v. Commissioner, 358 U.S. 59, 79 S.Ct. 104, 3 L.Ed.2d 30, 33 (1958); International Boxing Club v. U.S., 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed. 270, 279 (1959); Horton v. United States Steel Corp., 5 Cir., 1961, 286 F.2d 710. In my view, the necessary findings by the trial court are amply supported by substantial evidence; and the legal conclusions reached are well supported by the facts as found.[1]
 
 
 35
 There is only one appellant, a New York corporation, the Congress of Racial Equality (CORE), and the appellees are C. H. Douglas, Individually and as Mayor of the City of McComb, and Mr. and Mrs. Aubrey McGehee. There is no individual appellant-- only a corporate one. Only the appellant CORE is mentioned in the injunctive order.[2] No person but CORE gave notice of appeal. Designation of contents of the record on appeal was given only by CORE. Again, we emphasize that no individual appellant is involved. In spite of this fact, the majority grounds its opinion on the following reason:
 
 
 36
 'We find that the injunction below is an unconstitutional abridgement of the First Amendment rights, as protected by the Fourteenth Amendment, as a prior restraint on the freedom of speech.'
 
 
 37
 This is the first instance I have found where freedom of speech on the part of a corporate defendant is used as the basis for reversing a trial court in circumstances here present. As stated, the appellant CORE filed no pleadings seeking any relief on its own behalf or on behalf of any individual it claimed to represent; and it offered no evidence. There is no suggestion of a class action or the appearance of any litigant in a representative capacity. In Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1938), the court held:
 
 
 38
 'Natural persons, and they alone, are entitled to the privileges and immunities which 1 of the Fourteenth Amendment secures for 'citizens of the United States.' Only the individual respondents may, therefore, maintain this suit. 'Since freedom of speech and freedom of assembly are rights secured to persons by the due process clause, all of the individual respondents are plainly authorized by 1 of the Civil Rights Act of 1871 to maintain the present suit in equity to restrain infringement of their rights. As to the American Civil Liberties Union, which is a corporation, it cannot be said to be deprived of the civil rights of freedom of speech and of assembly, for the liberty guaranteed by the due process clause is the liberty of natural, not artificial, persons. Northwestern (Nat.) Life Ins. Co. v. Riggs, 203 U.S. 234, 255, (27 S.Ct. 126, 51 L.Ed. 168, 173, 7 Ann.Cas. 1104); Western Turf Ass'n v. Greenberg, 204 U.S. 359, 363 (27 S.Ct. 384, 51 L.Ed. 520, 522).'
 
 
 39
 See also Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1-201, 81 S.Ct. 1359, 6 L.Ed.2d 625 (1961); Adams v. City of Park Ridge, 293 F.2d 585 (7 Cir., 1961); International Ladies G.W.U. v. Seamprufe, D.C., 121 F.Supp. 165 (1954); The Constitution of the U.S., Corwin Ed. 1953, p. 809. The majority relies heavily on N.A.A.C.P. v. Ala., 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), but that case has no bearing on the issues here involved. There N.A.A.C.P. sought to protect its membership lists and affirmatively asserted such right. The court held that the Association could protect the right of anonymity of its members. The lists were in possession of the Association, and it alone could protect the privacy of them. As held by Hague and other cases, the right of free speech can not be asserted by an artificial persons. The majority further asserts:
 
 
 40
 'The posture of this case in particular is even more favorable to the defendants than was the Edwards case to the defendants therein, in that an injunction is involved here which prohibits the exercise of constitutionally guaranteed rights.'
 
 
 41
 The majority has overlooked the fact that the injunctive order relates only to one corporate defendant.
 
 
 42
 I am also at a loss to understand how the majority can make the following assertion:
 
 
 43
 'CORE and other organizations, organized for the purpose of peacefully demonstrating and speaking against unconstitutional state and local laws enforcing segregation, would then find themselves virtually inarticulate. These fundamental rights to speak, assemble, seek redress of grievances and demonstrate peacefully in pursuance thereto cannot be abridged merely because a riot might be threatened to be staged or that the police officers are afraid that breaches of the peace will occur if these rights are exercised.'
 
 
 44
 As pointed out in Note 1 CORE filed no responsible pleadings whatever except motions to dismiss; and it offered no evidence. The quoted assertion of the majority is the assertion of a fact unknown to the record. There is absolutely nothing in the record. There is absolutely for which CORE was organized, and regardless of that fact, the record does not show that CORE conducted itself on the occasion here involved for the purpose of '* * * peacefully demonstrating and speaking * * *' against certain laws and practices. On the record before us the majority can not, with logic, proclaim the purposes of the corporate defendant and pass upon its conduct on the occasions in question when there is no evidence to support such conclusions of fact. In its erroneous view of the facts, the majority states, 'The only incidence of malevolent behavior came from the white crowd milling around the terminal.' Throughout the opinion, the majority varnishes the conduct of the Negroes with benevolent descriptive terms, while at the same time characterizes the conduct of the white crowd as malevolent. Such conclusions and characterizations have no foundation whatever in the record. Indeed, the majority opinion gives one the impression that nothing happened and that all was 'sweetness and light' in McComb, Mississippi. Such a conclusion is contrary to the assertion of the appellant CORE in its own brief.[3] The use of such descriptive terms as 'All hell broke out', the arrest of 4 residents of McComb for 'disturbing the peace', the receipt of a telegram from the Justice Department requesting police protection, publicized movements with the presence of photographers, T.V. cameramen, and news reporters from distant cities, the presence of fists and brass knuckles, the attempt to break the window of a car, beating upon the counter and using provocative language, and other similar incidents, defy the description contained in the majority opinion.
 
 
 45
 As a matter of fact, not only were the police officers and the officials of the City of McComb alerted and disturbed, the record clearly shows that they were informed of the impending actions by agents of the F.R.I.[4] The local officers were also confronted with a restraining order issued on November 27, 1961, by a three judge court which resulted in some reluctance on the part of such officers to exercise any authority whatever. This feeling of restraint necessitated a call from these officials to the Justice Department in order to obtain advice and perhaps permission, as to what local police officers would be permitted to do. Indeed, the situation was discussed by the local officers and Honorable Burke Marshall, Assistant Attorney General, Chief of the Civil Rights Section of the Department of Justice. The following telegram was in evidence:
 
 
 46
 'In confirmation of our telephone conversation this morning you may be assured that the court order of November 27 does not in any way prohibit police action to protect persons using the bus terminals affected by the order. In our opinion the police of McComb are not only free but have a duty to take whatever steps are necessary, including the patrolling of the premises and the dispersal of crowds. The order and the Federal law contemplate that the police will provide the same protection to persons using the facilities of the bus terminals as is given to other citizens in the city. They may do so by any preventive or other means which do not have the purpose or effect of coercing racial segregation or interfering with the exercise of the rights protected by the order. You may be assured of our desire to cooperate and to be of assistance to the city in any way that we can in order to protect the safety of interstate travelers and to permit peaceful compliance with the order of the court and the law. 'Burke Marshall Asst Atty Gen Civil Rights Dic.'
 
 
 47
 The majority has held that notwithstanding the testimony about hell breaking loose; fisticuffs and boisterous conduct; the presence of the F.B.I. who alerted local police officers of coming events; a telephone conversation between local police officers and the Justice Department, and a telegram from the Justice Department, there was yet no evidence to support a reasonable inference that violence and public disturbance provoking a breach of the peace were involved. This conclusion is reached by the majority in the face of the fact that two experienced U.S. District Judges[5] had acted, one granting a temporary restraining order and the other a preliminary injunction.
 
 
 48
 If the situation had gotten out of hand; if the local police officers had refused to act; if the resident U.S. District Judges had refused to grant relief, the evidence indicates that people would have been injured and property would have been destroyed;[6] in which event there would have been a hue and cry, no doubt, that local officers did not believe in 'law and order', and wilfully refused to perform their duty.
 
 
 49
 The majority places great emphasis on the case of Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, but the opinion has misconstrued that decision. In the Edwards case the court was careful to point out:
 
 
 50
 'There was no evidence to suggest that these onlookers were anything but curious, and no evidence at all of any threatening remarks, hostile gestures, or offensive language on the part of any member of the crowd.'
 
 
 51
 In the instant case, both groups, Negro and White, were more than curious; there were threatening remarks, hostile gestures and offensive language. If not, why the concern of the F.B.I. and the Chief of the Civil Rights Section of the Justice Department in Washington, D.C.?[7]
 
 
 52
 Finally, the only order before us for review is one enjoining a corporate defendant '* * * from sponsoring, encouraging or financing persons to utilize the terminal facilities * * * for the purpose of fomenting violence or provoking breaches of the peace in or near said terminal facilities; or for such purpose after having publicized their purposes and intentions to so utilize or misuse such facilities; or for the purpose of creating or securing unto themselves notoriety and publicity, as the sponsoring organization of such fomentation and provocation; or for the purpose of testing the tempers and reactions of the local citizens of said City in the absence of local police protection.'[8] Expressly excluded from the operation of the injunction is '* * * any impingement upon the normal, usual or ordinary travel of any person in interstate or intrastate commerce to, through or from the City of McComb, Mississippi.'[9]
 
 
 53
 Only unlawful conduct is enjoined-- normal conduct is guaranteed by the order.
 
 
 54
 I would affirm.
 
 
 
 [1]
 The pertinent parts of the complaint are here set out for easy reference:
 'II
 'The defendant, Congress of Racial Equality and others associated with them are sponsoring, financing and encouraging John Doe and Mary Doe and others to come into the City of McComb City, after publicizing their intention so to do, in order to foment violence and to provoke breaches of the peace in and around the terminals and facilities used in McComb City for the transportation of passengers, mail and baggage into, through and from the City of McComb City.
 'III
 'This agitation on the part of John Doe and Mary Doe and others has provoked incidents of violence at the Greyhound Corporation bus terminal in McComb City and was calculated to, did and will continue to provoke future incidents of violence in and around said bus terminal, which said incidents of violence have resulted in great injury and damage to plaintiffs and each of them, and to the City of McComb City, which said damages are in excess of $10,000.00 in amount, exclusive of interest or costs, and are immediate and irreparable.
 'IV
 'Under and pursuant to a prior order of this court in the case of U.S.A. v. Mayor and Selectmen of McComb City, et al., being Civil Action No. 3215, the police officials and other officials of the City of McComb City have been enjoined from acts which might be construed as interference in any way or by any means with the conduct of the Greyhound Corporation and any and all other persons operating or using said terminals and facilities used in interstate commerce, a true copy of which injunction is attached hereto as Exhibit 'A'.
 'V
 'The plaintiffs, Mr. and Mrs. Aubrey McGehee, are the operators of the Greyhound Bus Terminal at 206 Canal Street in the City of McComb City, Mississippi, and were, until the acts and activities of the defendants herein forced them to close the same, the operators of a restaurant business in the said Greyhound Bus Terminal building.
 'VI
 'The acts of the defendants are wilful, intentional, deliberate acts which defendants have publicly announced to the newspaper, radio and television press media that they intend to continue. The defendants will, unless restrained by order of this court, continue to unlawfully sponsor, finance and encourage other persons to come to the said terminal facilities in the City of McComb City for the purpose of fomenting violence and provoking breaches of the peace in or near said terminal facilities in obstruction to and interference with the lawful rights of the plaintiffs, under the Constitution and laws of the United States of America and the State of Mississippi.
 'VII
 'The plaintiffs have no adequate remedy at law.
 'WHEREFORE, Plaintiffs pray this Honorable Court to permanently enjoin the Defendants, their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them, from continuing to unlawfully sponsor, finance or encourage persons to utilize the terminal facilities in the City of McComb City, Mississippi, for the purpose of fomenting violence and provoking breaches of the peace in or near the said terminal facilities.
 'Plaintiff prays for such further relief as the interest of justice may require.'
 
 
 [2]
 'There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction. It is the strong arm of equity, that never ought to be extended, unless to cases of great injury, where courts of law cannot afford an adequate and commensurate remedy in damages. The right must be clear, the injury impending and threatened, so as to be averted only by the protecting preventive process of injunction.' Truly v. Wanzer, 5 How. 141, 12 L.Ed. 88
 This is the standard announced by the same district court for the Southern District of Mississippi in denying injunctive relief to Negro plaintiffs in Clark v. Thompson, 206 F.Supp. 539, 543.
 
 
 [3]
 There is no dispute about the fact that the actions of the members of CORE in this case were for the avowed purpose of testing the segregation previously practiced in the terminal and recently declared invalid by the Federal District Court
 
 
 [4]
 Testimony was that the Chief of Police was informed that these Negroes would return that afternoon at 3:20, but arrived 30 minutes early, and that this was the reason none of his force was there
 
 
 [5]
 At first the demonstration was not going to be halted, but according to one city official, when the situation got out of hand and violence appeared to be imminent, he decided that the demonstration should be stopped. This was when the 15 minute directive was given
 
 
 [6]
 The Court pointed out that it was not until they were told to disperse on pain of arrest did they do more, and that even then there was no violence or threat of violence on their part, or on the part of any member of the crowd. Furthermore, there was ample police protection
 
 
 [7]
 There rights are not absolute. Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095
 
 
 [8]
 Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470
 
 
 [9]
 Congress of Racial Equality may assert the constitutional rights of its members. See N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488
 
 
 [1]
 A few typical examples of errors of fact contained in the majority opinion follow:
 
 
 [1]
 THE OPINION:
 'The evidence relative to the conduct of the CORE members was almost entirely favorable. They behaved in an 'appropriate manner,' never 'antagonistic,' never 'boisterous,' and in 'a reasonably quiet manner' according to the testimony of three of the plaintiff's witnesses.'
 THE RECORD:
 The only time the word 'antagonistic' is used relates to a time subsequent to the issuance of the temporary restraining order.
 'Q. Now, has the situation in your opinion in McComb changed at all from what it was last week?
 'A. Yes. sir.
 'Q. In what way has it changed? What have you observed about the city this week?
 'A. Following the issuance of the temporary restraining order signed by Judge Mize, and when the public became aware of it, the situation cleared up tremendously.
 'Q. Did members of the colored race ride a bus into McComb yesterday?
 'A. Yesterday? I will have to look. Yes, sir. Yes, of course.
 'Q. That would be Wednesday, this past Wednesday, the 6th of December?
 'A. Yes, sir.
 'Q. Were there any incidents or disturbances?
 'A. No.
 'Q. Were there any unusual or large crowds gathered at the bus station when the bus arrived bearing these people?
 'A. There might have been up to six or eight more people than would be considered normal down there at the time.
 'Q. Were they in your opinion antagonistic, or did you observe-- let's put it this way, did you observe these people that were there, these six or eight that you say would not normally be there? Did they exhibit any antagonistic motions or did they exhibit any antagonism in their voices or manner that you could observe?
 'A. No, sir.'
 
 
 [2]
 THE OPINION:
 'In fact, with the exception of the one incident of demanding service by beating on the counter, the testimony disclosed that the Negroes acted in no way hostile, violent or provoking. At all times they behaved in an orderly fashion.'
 THE RECORD:
 'Mr. McGehee said that he was inside the bus station and they approached and started to the counter, to the lunch counter, and he told them, 'That is a private business not operated by the Greyhound Company and you can not use this side of it'. His words were, 'They walked through me and sat down'. He said, 'I followed them and went on the other side of the counter and told them, 'I can not serve you here. This is a private business and I can not serve you. If you will go through that door to the other side we will serve you.' He said at about that time he had to go to the south a few feet to sell a ticket and that-- if you will pardon the words, the words he told me-- 'all hell broke loose'.'
 
 
 [3]
 THE OPINION:
 'It was clear that the rides were publicized, but there is little evidence to indicate how the press got hold of the planned trips. One of the local CORE officials said that he knew of no planned publicity.'
 THE RECORD:
 'Q. Mr. Mayor, in the conversation that you had with Mr. Burke Marshall in the U.S. Attorney's Office did he tell you what connection CORE, or the Congress of Racial Equality, had with these people that were coming to McComb?
 'A. Not in this particular conversation that we are referring to now.
 'Q. In any subsequent conversation that you had with Mr. Burke Marshall?
 'A. Yes, sir.
 'Q. What did he describe to you to be CORE's part in these activities?
 'A. He told me, or his office told me, I don't know whether it was he or Mr. what is the attorney with him?
 'Q. Heilbord.
 'A. Heilbord-- if I had any suggestion to make to them, feel free to do so. And I said to him, I asked him if I could make a suggestion-- now, this is Mr. Marshall-- and he said yes. I said, 'If we can have these publicized movements discouraged and discontinued it will be a lot of help to us in maintaining and keeping peace and order'. And reference was made to CORE's movements, announced movements, and I said, 'If Washington will use their influence or what influence they have to discourage that it will be helpful'. He said, 'I'll do that today and call you back,' and he called me back and he said that he'd had a telephone conversation with CORE's headquarters and they had promised to discontinue these publicized movements. Now, that's what he said to me in a subsequent telephone conversation. * * *'
 'Q. Tell us what the stories that were carried over the regular news media in McComb stated on Thursday with regard to the intentions, if any, of persons who had been in McComb on Wednesday to return to McComb, or particularly to the bus station or train station at McComb.
 'A. The Associated Press wire service stated that the five Negroes after their return to New Orleans were engaged in meetings there, and several of them were quoted in interviews in which they said that they had no immediate plans at that moment but that they did plan to return.'
 
 
 [4]
 THE OPINION:
 'CORE and other organizations, organized for the purpose of peacefully demonstrating and speaking against unconstitutional state and local laws enforcing segregation, would then find themselves virtually inarticulate.'
 THE RECORD:
 The record is totally silent. Except for motions to dismiss, CORE filed nothing and proved nothing. On this point there are no allegations and no proof.
 
 
 [2]
 There is the usual provision including '* * * its officers, agents, servants, employees, attorneys and those persons acting in active concert or active participation with them who receive actual notice of this order, by personal service or otherwise.'
 
 
 [3]
 The following is from the brief of CORE at page 3:
 'Almost immediately thereafter, in McGehee's words, 'All hell broke out' (R. 115). The negroes were forcibly ejected from the terminal by members of the crowd (R. 85). On the following day, as a result of that incident, four residents of McComb were arrested for 'disturbing the peace' (R. 86, 101).
 'On the same day, after receiving a telegram from the Justice Department (R. 218) requesting police protection at the terminal, the Selectmen of the city authorized the police to patrol the terminal on a regular basis (R. 103-4, 209).
 'On Friday a field representative of CORE met the 1:30 bus from New Orleans (R. 175) and picked up a group of five Negro passengers (R. 178) without incident (R. 178-9). The negroes returned to New Orleans on the 3:30 bus (R. 185).
 'On Saturday, December 2d, the field representative of CORE met negro passengers, all natives of McComb (R. 182) who had arrived from Jackson, Mississippi. The negroes left the bus and used the terminal without incident (R. 187) but as they entered the auto of the CORE representative a crowd that had gathered beat the auto with fists and brass knuckles, kicked the sides and attempted to break the window of the car (R. 188). A police officer intervened and the beating stopped (R. 188).'
 
 
 [4]
 The following is from the record, pp. 204-205 and 206-208:
 'Q. On Tuesday evening, November 28, 1961 did you receive a telephone call from any member of the Federal Bureau of Investigation?
 'A. I did.
 'Q. Who was that man who called you?
 'A. Jack Quigley.
 'Q. Speak up a little.
 'A. Mr. Jack Quigley.
 'Q. And what did he tell you on that occasion?
 'A. He informed me that CORE was planning another ride for the next day to McComb.
 'Q. Now, you say another ride. This would have actually been the first one?
 'A. The first ride to McComb.
 'Q. This would have been for the next day, which would have been a Wednesday, is that right, sir?
 'A. Correct.
 'Q. Now, on Wednesday did a group of people come into the McComb-- a group of colored people come into the McComb bus terminal from New Orleans?
 'A. They did.
 'Q. Was this in accordance with your information from Mr. Quigley?
 'A. Yes, sir.
 'Q. Was Mr. Quigley at that time in McComb, Mississippi?
 'A. Yes, sir, he had arrived in McComb.
 'Q. At any time during the day of Wednesday, the 29th of November, 1961, did Mr. Quigley contact you with any message as to the intent or intentions of this group of persons?
 'A. Yes, sir, he did.
 'BY MR. RACHLIN: I wish to clarify the question.
 'BY THE COURT: Let me get that question again.
 (The reporter read the last question and the last answer)
 'BY MR. CLARK: If Your Honor please, I am again emphasizing to you that it is not my purpose by this question to prove what these intentions were, but simply to prove the fact that this police officer received a communication on that day from another police officer and what that communication was.
 'BY THE COURT: I overrule the objection.
 'BY MR. CLARK (Continuing):
 'Q. Did he contact you and tell you what these persons planned to do?
 'A. He did.
 'Q. What did he tell you that they planned to do?
 'A. He told me that he had been in contact with these people that came in on the bus and their intentions were to go to the bus station at 3:20 or 3:25 and catch the 3:30 bus out of McComb.
 'Q. All right, sir. Now, while Mr. Quigley was there in your office, or in the City Hall where your office is located, do you know whether any of these persons did come to the bus station?
 'A. I did not know at that time.
 'Q. What was the first indication that you had that they were at the bus station, these five colored persons that had come in that morning?
 'A. Mr. Quigley came back to my office, he called me out in the hall and told me that there had been a fight at the bus station, that I had better get down there and see about it.
 'Q. All right, sir, now, what time was it that Mr. Quigley told you that?
 'A. Shortly after three o'clock.
 'Q. And then did you go and investigate the fight?
 'A. I did.
 'Q. What did that investigation disclose to you as to whether or not these five persons had come back about thirty minutes before they told you they were coming?
 'A. When I arrived on the scene all the persons involved--
 'Q. When you were told that they were coming.
 'A.-- they had gone, and I immediately tried to find them. I looked all afternoon and it was six o'clock that afternoon before I did find them.
 'Q. Did you find those persons to be the same five colored people that rode in from New Orleans?
 'A. They were, yes, sir.
 'Q. So it was your information that morning from the Federal Bureau of Investigation that they would not be at the bus station until 3:25?
 'A. That's correct.
 'Q. But apparently they did not go there at that time?
 'A. They apparently jumped the gun. That's what they did.'
 
 
 [5]
 Judge Mize issued a temporary restraining order on the 2nd day of December 1961; and Judge Cox issued a preliminary injunction on the 22nd day of December 1961
 
 
 [6]
 As shown by the testimony of witness Gordon:
 'Q. If this temporary restraining order is removed do you think that burden-- do you believe as the police commissioner that that burden will return to the police force?
 'A. If the temporary restraining order is removed and these people come back in to visit that bus station chaos will result.
 'Q. Do you believe that it will place a burden on your police force in McComb?
 'A. An intolerable burden.'
 
 
 [7]
 The record is replete with incidents of violence and potentially explosive situations among which are the following:
 In response to a question concerning the investigation made of a disturbance on Wednesday, the first day that the CORE members came in, the police commissioner of McComb testified:
 'They disclosed that a photographer had been taking pictures in the vicinity of the bus station all day and that about 2:00 o'clock p.m. he was in the vicinity of the bus station, he was questioned and a fight developed between him and one or more persons also there.'
 Police Chief George Guy testified to 5 Negroes being beaten and ejected from the bus terminal on Wednesday at a time when the police department was investigating the photographer fracas above mentioned.
 Witness McGehee testified that one of the 5 negroes who were ejected beat upon the counter of the bus terminal restaurant with a knife and in a loud provocative voice demanded: 'Why in the hell can't we get service in here?'
 The police chief testified that four men were arrested and charged with assault and battery on Thursday in connection with the fight in the bus station on Wednesday.
 On Friday, a photographer was seen being chased through town:
 '* * * I did observe a man running pell mell northward carrying a camera in his hand with a crowd of people chasing him on both sides of the street. I did also observe various, many repeated assemblies in small groups of people during the day.'
 
 
 [8]
 Although the majority considers it of no importance, it is a fact that the F.B.I. informed the Chief of Police of the City of McComb that these Negroes would return at 3:20, but actually they came 30 minutes early, and arrived before the police
 
 
 [9]
 There is evidence in the record that the facilities formerly used by white persons had been used by negroes for months without incident until the occurence of the events under review:
 'Q. Over what period of time have you noticed colored persons entering into the west side or what was formerly designated as the white waiting room in the terminal there? How long had this been going on?
 'A. Mr. Clark, I don't believe I can answer your question. It has been quite a while.
 'Q. Could you give me some general estimate as to whether it has been in the term of months or years?
 'A. I had rather say months, but I can't be sure about that. I had rather say months.
 'Q. Have you ever seen violence as a result of colored people coming into that terminal?
 'A. No, none.
 'Q. Has there been any publicity about these former visitors in this white side of the waiting room, or what used to be the white side of the waiting room?
 'A. No, sir.
 'Q. So that prior to this time there have been colored people in there without incident?
 'A. Yes, sir. I'm thinking, or my judgment is that we were notified that those people were coming there as agitators. This was what I have learned later, that they notified the people that they were coming there as agitators and to create a disturbance, which I think they have done. They did it up brown.'