REPRINTED OPINION

Chris DOE, et al., Plaintiffs,

Advocacy Center For Persons With Disabilities, Inc., Plaintiff-Appellee,

v.

Carlos E. STINCER, Dr., et al., Defendants,

Attorney General, Attorney for the State of Florida, Defendant-Appellant.

No. 98-4027.

United States Court of Appeals,

Eleventh Circuit.

May 4, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 96-2191-CV-FAM), Federico A. Moreno, Judge.

Before HATCHETT, Chief Judge, BARKETT, Circuit Judge, and RONEY, Senior Circuit Judge.

BARKETT, Circuit Judge:

The Attorney General of the State of Florida appeals the district court's order permanently enjoining the enforcement of Fla. Stat. Ann. § 395.3025(2) as preempted by the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"). The Attorney General argues that the district court erred in enjoining the statute because the Advocacy Center for Persons With Disabilities, Inc. ("Advocacy Center") lacked standing and because the grant of injunctive relief was an abuse of discretion. We vacate the injunction granted by the district court and remand for further proceedings.

BACKGROUND

On August 7, 1996, Chris Doe filed this action against the Attorney General of Florida, Mercy Hospital, and two psychiatrists, Dr. Carlos Stincer and Dr. Hugo Gonzalez, who examined and treated Doe at Mercy Hospital. Doe claimed that the failure of the hospital and its doctors to provide her with her medical records violated the ADA and that the Florida statute permitting them to do so, § 395.3025(2), was preempted by the ADA. In an amended complaint, Doe added as plaintiffs the American Civil Liberties Union and the

Advocacy Center, a federally-authorized protection and advocacy organization established under the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII"), 42 U.S.C. § 10801, and the Protection and Advocacy of Individual Rights Act ("PAIR"), 29 U.S.C. § 794e.

Section 395.3025 provides hospital patients with a right to obtain their medical records. Under its terms, "[a]ny licensed facility, shall, upon written request, and only after discharge of the patient, furnish, in a timely manner, without delays for legal review, to any person admitted therein for care or treatment or treated thereat ... a true and correct copy of all patient records, ..., which ... are in the possession of the licensed facility...." § 395.3025(1). However, § 395.3025(2) states that "[t]his section does not apply to records maintained at any licensed facility the primary function of which is to provide psychiatric care to its patients, or to records of treatment for any mental or emotional condition at any other licensed facility...." While this case was pending in the district court, the Florida legislature enacted § 394.4615, spelling out a patient's right of access to mental health records, amending § 395.3025(1) in accordance with § 394.4615.[1] Under § 394.4615,

> Patients shall have reasonable access to their clinical records, unless such access is determined by their patient's physician to be harmful to the patient. If the patient's right to inspect his or her clinical record is restricted by the facility, written notice of such restriction shall be given to the patient and the patient's guardian, guardian advocate, attorney, and representative. In addition, the restriction shall be recorded in the clinical record, together with the reasons for it. The restriction of a patient's right to inspect his or her clinical record shall expire after 7 days but may be renewed, after review, for subsequent 7-day periods.

§ 394.4615(9).

This case was resolved on motions for summary judgment. On December 2, 1997, the district court granted Advocacy Center's motion for summary judgment, concluding that the Advocacy Center had standing to sue and that Fla. Stat. § 395.3025(2) was preempted by the ADA. Accordingly, the district court permanently enjoined its enforcement. On the same day, the district court denied summary judgment both

---

[1]Prior to the enactment of § 394.4615, Florida law left to the unfettered discretion of hospitals and their physicians the decision whether to provide a patient with a copy of his or her mental health records.

to Doe and the American Civil Liberties Union, concluding that additional discovery was necessary to determine whether either of them had standing to sue. The district court also dismissed Doe's complaint against Dr. Gonzalez, finding that it did not state a claim under the ADA. The Attorney General then filed this interlocutory appeal. We have jurisdiction over the Attorney General's appeal under 28 U.S.C. § 1292(a)(1), which gives us appellate jurisdiction over orders granting injunctions. Because the district court did not enter a final judgment as to the claims of Doe and the American Civil Liberties Union, their claims are not before us.

DISCUSSION

I.

This case presents the question, one of first impression in this Circuit, whether a federally-authorized protection and advocacy organization established under PAMII and PAIR has standing to challenge a state statute limiting access to mental health records on behalf of individuals with mental health disabilities. Before turning to PAMII and PAIR and their grant of standing to protection and advocacy systems, we review the well-established general principles governing associational or organizational standing.

A.

It has long been settled that an organization has standing to sue to redress injuries suffered by its members without a showing of injury to the association itself and without a statute explicitly permitting associational standing. In *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Supreme Court first explicitly recognized that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Id.* at 511, 95 S.Ct. 2197. The Court stated that "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.* "So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable ..., the

3

association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction."

*Id.*

In *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court refined *Warth* 's requirements into a three-part test for associational standing. Under *Hunt,* "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343, 97 S.Ct. 2434; *see also United Food and Commercial Workers Union v. Brown Group, Inc.,* 517 U.S. 544, 552-53, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). These are the sole requirements. Accordingly, under *Hunt,* an association may bring suit on behalf of its members or constituents despite the fact that individual members have not actually brought suit themselves. Nor must the association name the members on whose behalf suit is brought. As we have stated, "neither unusual circumstances, inability of individual members to assert rights nor an explicit statement of representation are requisites." *Church of Scientology v. Cazares,* 638 F.2d 1272, 1279 (5th Cir.1981).

In *United Food,* the Supreme Court considered associational standing under an explicit congressional grant of standing. The Court indicated that the first two prongs of the *Hunt* test are Article III requirements which must always be satisfied to establish standing, but that the third prong is only a prudential requirement, which may be eliminated by Congress. *United Food,* 517 U.S. at 555-58, 116 S.Ct. 1529. The Court explained that

> [t]here are two ways in which *Hunt* addresses the Article III requirements of injury in fact, causal connection to the defendant's conduct, and redressability. First and most obviously, it guarantees the satisfaction of these elements by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim ... pleaded by the association.... *Hunt* 's second prong is ... complementary to the first, for its demand that an association plaintiff be organized for a purpose germane to the subject of its member's claims raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary.

*Id.* at 555-56, 116 S.Ct. 1529. However, "once an association has satisfied *Hunt*'s first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more." *Id.* at 556, 116 S.Ct. 1529. Thus, "the third prong of the associational standing test is best seen as focusing on ... matters of administrative convenience and efficiency, not on elements of a case and controversy within the meaning of the Constitution." *Id.* at 557, 116 S.Ct. 1529.

B.

With this framework in mind, we turn to PAMII and PAIR. Congress, recognizing that "individuals with mental illness are vulnerable to abuse and serious injury," enacted PAMII in 1986 "to ensure that the rights of individuals with mental illness are protected" and "to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will ... protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes...." 42 U.S.C. § 10801(a)(1), (b)(1), (2)(A). Under PAMII, a protection and advocacy system, such as the Advocacy Center, is vested with

> the authority to ... pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and pursue administrative, legal, and other appropriate remedies on behalf of an individual who ... was an individual with a mental illness; and ... is a resident of the State, but only with respect to matters which occur within 90 days after the date of discharge of such individual from a facility providing care or treatment.

§ 10805(a)(1)(B), (C).

Supplementing PAMII's protections, Congress enacted PAIR in 1992. PAIR authorizes protection and advocacy organizations, such as the Advocacy Center, to provide services to individuals with disabilities who are not eligible for services under pre-existing protection and advocacy legislation, including PAMII.

5

*See* 29 U.S.C. § 794e(a)(1) (providing that PAIR is applicable when individuals are not eligible for services under PAMII because they do not meet PAMII's definition of "individuals with mental illness").[2]

Under PAMII and PAIR, there are two theories under which a protection and advocacy system may sue. First, it may seek to establish that the defendant's actions caused injury to the protection and advocacy system itself. We implicitly recognized a protection and advocacy system's standing to redress injuries to itself in *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.,* 97 F.3d 492 (11th Cir.1996). There, we held that a protection and advocacy organization had a right to sue under the Developmental Disabilities Assistance and Bill of Rights Act to obtain records relating to the deaths of two residents at a facility for mentally retarded persons. Because the organization itself had a right to the records, it had standing to sue to redress the injury to itself caused by the facility's refusal to provide those records. However, in this case, the Advocacy Center does not seek to establish standing based on injuries to itself. Although PAMII includes detailed provisions granting a protection and advocacy organization a right to obtain records, including mental health records, and provides a means to disclose those records to the individual described in the records under certain circumstances, *see* 42 U.S.C. § 10805(a)(4), § 10806(b), the Advocacy Center has not sought to use these provisions in this case. Second, as the text of PAMII indicates, a protective and advocacy organization may sue on behalf of its constituents during the course of their treatment or within ninety days after being discharged from a treatment facility pursuant to § 10805(a)(1)(B), (C), subject, of course, to the requirements of Article III as laid out in *Hunt* and its progeny. It is this latter type of standing with which we concern ourselves here.

## II.

We turn now to the Attorney General's argument that the Advocacy Center lacks standing in this case. First, the Attorney General argues that the Advocacy Center lacks standing under PAMII because it has not brought suit on behalf of a specific individual who has been denied records pursuant to Fla. Stat. Ann. §

---

[2]Because the parties and the district court focus first and foremost on PAMII, we do so as well.

395.3025(2). According to the Attorney General, because PAMII authorizes a protection and advocacy system to bring suit "to ensure the protection of individuals with mental illness," § 10805(a)(1)(B), there can be no standing under PAMII in the absence of a specific individual. Second, the Attorney General argues that the Advocacy Center cannot sue as an association under the first prong of *Hunt* because it has no members who would have standing to bring suit in their own right. Consequently, the Attorney General argues that, because the first prong of *Hunt* is a mandate of Article III, even assuming that the Advocacy Center has standing under PAMII, PAMII's grant of standing offends Article III. We reject these arguments.

A.

As to the Attorney General's first argument, nothing in PAMII can reasonably be read to require the Advocacy Center to name a specific individual in bringing suit to redress violations of the rights of individuals with mental illness. The text of PAMII grants standing to protection and advocacy systems to pursue legal remedies to "ensure protection of individuals with mental illness." § 10805(a)(1)(B). Considering the statute as a whole, we cannot read this language to requires a protection and advocacy system to name a specific individual in order to have standing to sue. The very purpose of PAMII was to confer standing on protection and advocacy systems, such as the Advocacy Center, as representative bodies charged with the authority to protect and litigate the rights of individuals with mental illness. As the district court correctly recognized, the standing of protection and advocacy systems as representatives of the segment of our society afflicted with mental illness is well-established in the law. *See Trautz v. Weisman,* 846 F.Supp. 1160, 1162-63 (S.D.N.Y.1994); *Rubenstein v. Benedictine Hosp.,* 790 F.Supp. 396, 407-09 (N.D.N.Y.1992); *Goldstein v. Coughlin,* 83 F.R.D. 613, 614-15 (W.D.N.Y.1979); *Naughton v. Bevilacqua,* 458 F.Supp. 610, 616 n. 3 (D.R.I.1978), *aff'd on other grounds,* 605 F.2d 586 (1st Cir.1979); S.Rep. No. 103-120, at 39 (1994), *reprinted in* 1994 U.S.C.C.A.N. 164, 202 ("[T]he current statute is clear that [protection and advocacy] systems have standing to pursue legal remedies to ensure the protection of and advocacy for individuals with [mental illnesses] within the State.").

7

Moreover, under Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought and we decline to create such a requirement in PAIMI. *See Cazares,* 638 F.2d at 1278 ("[T]he requisite for representational standing ... is not necessarily an explicit statement of representation but a close nexus between the organization and its members and an allegation of injury to its members as a result of the action") (citations omitted); *Congress of Racial Equality v. Douglas,* 318 F.2d 95, 102 (5th Cir.1963) (upholding right of civil rights organization to assert the constitutional rights of its members despite the fact that pleadings did not seek relief on behalf of any specific member).[3] As these cases hold, it is enough for the representative entity to allege that one of its members or constituents has suffered an injury that would allow it to bring suit in its own right.

## B.

Nor do we agree with the Attorney General's second argument—that the Advocacy Center lacks standing under Article III to sue as an association under *Hunt* because it is not a membership organization. The Attorney General argues that the Advocacy Center cannot meet the first prong of *Hunt*—an Article III requirement—because it is not suing on behalf of any members of the Advocacy Center.[4] He principally relies on the Fifth Circuit's decision in *Association of Retarded Citizens v. Dallas County Mental Health & Retardation Ctr. Bd. of Trustees,* 19 F.3d 241 (5th Cir.1994). In that case, the Fifth Circuit held that a protection and advocacy organization lacked standing to sue on behalf of persons with developmental disabilities. The court held that the organization lacked standing because the individual the organization sought to represent "is not a 'member' of Advocacy, Inc." *Id.* at 244. The court stated that "[t]he organization bears no relationship to traditional membership groups because most of its 'clients'—handicapped and

[3]Decision of the former Fifth Circuit decided prior to September 30, 1981 are binding on this court. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206 (11th Cir.1981) (en banc).

[4]There is no suggestion that the Advocacy Center cannot satisfy *Hunt* 's second prong, which is the other Article III requirement for associational standing.

8

disabled people—are unable to participate in and guide the organization's efforts." *Id.* However, we cannot subscribe to the Fifth Circuit's reasoning because we think that, as was the case in *Hunt,* the fact that the Advocacy Center has constituents rather than members does not deprive it of Article III standing here.

In *Hunt,* the Supreme Court held that the Washington State Apple Advertising Commission had standing to challenge a North Carolina statute prohibiting the display of Washington State apple grades. The Apple Advertising Commission, like the Advocacy Center here, was established by the Washington legislature to protect and advance the interests of a particular segment of the community—the State's apple growers and dealers. Like the Advocacy Center, the Apple Advertising Commission was not a membership organization. The Court nonetheless held that the Commission could sue on behalf of the state's apple growers, specifically rejecting the argument that the Apple Advertising Commission lacked standing because it did not have any members.

The Court explained that the "Commission, while admittedly a state agency, for all practical purposes performs the function of a traditional trade association representing the Washington apple industry.... It ... serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation." *Hunt,* 432 U.S. at 344, 97 S.Ct. 2434. The Court also pointed out that the apple growers and dealers, while not members of the Apple Advertising Commission, "possess all the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through the assessments levied upon them." *Id.* at 344-45, 97 S.Ct. 2434. Finally, the Court noted that "the interests of the Commission itself may be adversely affected by the outcome of this litigation" since a reduction in apple sales would lead to reduced assessments due to the Commission. *Id.* at 345, 97 S.Ct. 2434.

We find the Advocacy Center to be analogous to the Apple Advertising Commission in *Hunt.* To begin with, as in *Hunt,* Congress designated the Advocacy Center, like other protection and advocacy

9

systems, to "serve[ ] a specialized segment of the ... community which is the primary beneficiary of its activities, including prosecution of this kind of litigation." *Id.* at 344, 97 S.Ct. 2434. Specifically, under PAMII, Congress authorized protection and advocacy organizations such as the Advocacy Center to act as agencies to protect and enforce the rights of individuals with mental illness, "perform[ing] the functions of a traditional ... association representing [individuals with mental illness]." *Id.*

Further, under PAMII, individuals with mental illness possess "the indicia of membership in an organization." *Id.* In PAMII, Congress directed that multi-member governing boards of protection and advocacy organizations such as the Advocacy Center must be composed of "members who broadly represent or are knowledgeable about the needs of clients served by the system" and must "include individuals who have received or are receiving mental health services and family members of such individuals." 42 U.S.C. § 10805(c)(1)(B); *see also* 42 C.F.R. § 51.22(b)(2). Moreover, protection and advocacy organizations must have advisory councils, sixty percent of whose membership as well as the chair of the council must be "comprised of individuals who have received or are receiving mental health services or who are family members of such individuals." § 10805(a)(6)(B), (C); 42 C.F.R. § 51.23(b)(1), (2). Additionally, PAMII provides that a protection and advocacy organization must afford the public with an opportunity to comment on the priorities and activities of the protection and advocacy system and must establish a grievance procedure for clients and prospective clients "to assure that individuals with mental illness have full access to the services of the system" and "that the eligible system is operating in compliance with [PAMII]." § 10805(a)(8), (9); 42 C.F.R. §§ 51.24, 51.25. Much like members of a traditional association, the constituents of the Advocacy Center possess the means to influence the priorities and activities the Advocacy Center undertakes. "In a very real sense," therefore, as in *Hunt,* "the [Advocacy Center] represents the State's [individuals with mental illness] and provides the means by which they express their collective views and

10

protect their collective interests." *Hunt,* 432 U.S. at 345, 97 S.Ct. 2434.[5]  Accordingly, we conclude that the Advocacy Center may sue on behalf of its constituents like a more traditional association may sue on behalf of its members.

C.

The right to sue on behalf of its constituents, however, does not relieve the Advocacy Center of its obligation to satisfy *Hunt* 's first prong by showing that one of its constituents otherwise had standing to sue to support the district court's grant of summary judgment and injunctive relief.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (noting that elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.* with the manner and degree of evidence required at successive stages of the litigation").  In support of its summary judgment motion, the Advocacy Center relied solely on the affidavit of Dana Farmer, the director of the Advocacy Center's PAMII program.

The Farmer affidavit contains two allegations pertinent to the Advocacy Center's standing.  Paragraph seven states that "[b]ased on complaints and information received by the Advocacy Center, many Floridians who want to see their mental health records are denied access.  Others do not even try to gain access to their records because they believe that such efforts would be futile, given the statutory protection available to licensed facilities under Florida law."  Paragraph eight of Farmer's affidavit states that "[o]n August 1, 1997, the Advocacy Center received a complaint from an individual that she had been denied access to her treatment

---

[5]We also note that, as in *Hunt,* "the interests of the [Advocacy Center] itself may be adversely affected by the outcome of this litigation." *Id.* In *Hunt,* the Court recognized this interest in terms of the possibility that the challenged statute, if enforced, might reduce the assessment owed to the Apple Advertising Commission.  Although the Advocacy Center has no similar direct financial interest in this litigation, the issue of access to records is an important issue for the Advocacy Center's clients and, to the extent that the Advocacy Center devotes its work to assisting clients in obtaining records, other needs may go unmet.  This "nexus between the interests of the [Advocacy Center] and its constituents coalesces with the other factors noted above to 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions.' " *Id.* (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

11

records, as permitted by § 395.3025(2)." Attached to the affidavit is a fax cover sheet stating that a specific authorization is required to release psychiatric, drug, alcohol, or HIV information and that records of such information cannot be released to a patient.

The Attorney General argues that the Farmer affidavit was insufficient to support the Advocacy Center's standing. We agree. These two paragraphs do not contain any evidence that any of the Advocacy Center's constituents have been denied access to mental health records based on the Florida statute at issue here. Without such allegations, the Advocacy Center cannot show that any of its clients suffered a concrete injury that is traceable to the challenged statute and could be redressed by a favorable decision in this action—as it must to establish standing under *Hunt. See United Food,* 517 U.S. at 555, 116 S.Ct. 1529.[6] The Farmer affidavit tells us that many Floridians have been denied access to mental health records and that others do not request their records, believing such efforts to be futile. It does not, however, state that any of these persons were clients of the Advocacy Center and it does not state that the health care facility denied them access on the basis of the Florida statute at issue here. Nor does the affidavit state that these persons were currently receiving treatment or that they had been discharged in the past ninety days—the class of persons with mental illness whom the Advocacy Center may represent under PAMII. Likewise, the paragraph detailing a recent complaint received by the Advocacy Center does not state that the individual in question was seeking mental health records and does not state that the denial was based on the Florida statute at issue here. As the Attorney General points out, the hospital that denied the request may have been acting in

---

[6]The Attorney General suggests that the Advocacy Center cannot establish the redressability prong of Article III standing because the Attorney General has no enforcement authority over the Florida statute at issue here. However, even assuming that the Attorney General lacks the necessary enforcement authority to support the grant of injunctive relief enjoining the statute's enforcement, it does not follow that any injuries to the Advocacy Center's constituents cannot be redressed by a favorable ruling in this action. The amended complaint in this action requested both declaratory and injunctive relief. Even if injunctive relief is not appropriate, a favorable ruling could result in a declaratory judgment against the Attorney General holding the Florida statute invalid under the ADA. Thus, although we vacate the injunction entered by the district court, we do not agree that the Advocacy Center lacks standing under the redressability prong of Article III.

12

violation of Florida law. Consequently, as to this individual, the Advocacy Center has not established that this patient's injury was caused by the Florida statute at issue and that the injunctive relief requested by the Advocacy Center will redress this injury.

The Advocacy Center may well be able to establish its standing to sue in this case. On this record, however, it has not done so. Accordingly, the district court erred in enjoining the Florida statute at issue here. The judgment of the district court is therefore VACATED and the case is REMANDED for further proceedings consistent with this opinion.

RONEY, Senior Circuit Judge, concurring specially:

I concur in the decision of the court that the injunction against the Attorney General cannot stand.

The sole issue before us on this appeal is whether the district court erred in entering a judgment that "Defendant Bob Butterworth, Attorney General of the State of Florida, is permanently enjoined from enforcing section 395.3025(2), Florida Statutes, and is further enjoined from promulgating any regulation, rule, policy, procedure, practice or guideline which is based on or relies upon section 395.3025(2), Florida Statutes."

In my judgment, this injunction must be reversed on two independent grounds argued by the Attorney General on this appeal.

*First,* and this is a reason relied upon by the Court's opinion, the Advocacy Center for Persons With Disabilities, Inc. ("Advocacy Center") has not established that there is no genuine issue of material fact concerning alleged actions under section 395.3025(2), Florida Statutes, which would violate the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"). I agree with the Court's decision that the two paragraphs in the Dana Farmer affidavit:

> do not contain any evidence that any of the Advocacy Center's constituents have been denied access to mental health records based on the Florida statute at issue here. Without such allegations, the Advocacy Center cannot show that any of its clients suffered a concrete injury that is traceable to the challenged statute and could be redressed by a favorable decision in this action.

13

There are three sources of authority that the Advocacy Center can assert in bringing this action. **First**, it may seek redress for injuries to itself from defendant's actions. *See Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.,* 97 F.3d 492 (11th Cir.1996). **Second**, under the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII"), 42 U.S.C. § 10805(a)(1)(B), it may "pursue...legal...remedies to ensure the protection of individuals with mental illness who are receiving care and treatment in the State." This provision relates to litigation concerning the general population of individuals with mental illness, the Advocacy Center's constituents as a whole or certain constituents as a group, so to speak, and would not seem to require that the action be brought on behalf of a specific individual. **Third**, under section 10805(a)(1)(C), it may "pursue...legal...remedies on behalf of an individual with mental illness" who "is a resident of the State" and who meets certain qualifications. This subsection requires that the action be brought on behalf of a specific individual.

As the Court has held, the Advocacy Center has not sought redress under the first or third of these sources of authority, and has not established that there are individuals who need a remedy or protection under the second source of authority.

*Second*, regardless of the standing of the Advocacy Center to challenge the constitutionality of the Florida statute, the injunction entered by the district court should be reversed for entirely independent reasons. It should be kept in mind that to the extent the district court's judgment can be read as a declaratory decree concerning the validity of the Florida statute, that aspect of the decision is not now before us on this interlocutory appeal. We only have jurisdiction to consider the entry of the injunction against the Attorney General.

The injunction must be reversed for one reason argued by the Attorney General.

The defendant Bob Butterworth, neither individually nor as Attorney General of the State of Florida has any authority to enforce the statute challenged nor can he either prevent action pursuant to the statute or redress any injury allegedly suffered because of the invalidity of the statute. That he may be the proper

14

defendant in a declaratory decree action challenging the validity of a Florida statute does not mean that it is proper to enter an injunction against him.

In *ACLU v. Florida Bar*, 999 F.2d 1486 (11th Cir. 1993) and *Socialist Workers Party v. Leahy*, 145 F.3d 1240 (11th Cir. 1998), relied upon in this Court's opinion, the appellate court found that the governmental defendants had specific enforcement authority over the challenged statutes. The other case cited in the Court's opinion, *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir.), *cert. denied sub nom. Standard Oil Co. v. Florida ex rel. Shevin*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976) simply held that the Attorney General was the proper state official to bring an antitrust action under the Sherman Act on behalf of the State of Florida.

In this case, the Advocacy Center has failed to point out any action which the Attorney General would or could take to enforce the statute against any doctor, hospital or mental institution. It is improper to bring the full force of a federal injunction against the Attorney General in the absence of any showing that, but for the injunction, he would either take steps to enforce section 395.3025(2), Florida Statutes, or would promulgate any regulation, rule, policy, precedure, practice or guideline which is based on or relies upon section 395.3025(2), Florida Statutes.

I thus concur in the reversal of the injunction.