[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10349
_____

D.C. Docket No. 1:12-cv-02978-WSD

AMERICA'S HEALTH
INSURANCE PLANS,

                                        Plaintiff-Appellee,

versus

RALPH T. HUDGENS, in his Official
Capacity as Georgia Insurance and Safety
Fire Commissioner,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 14, 2014)

Before HILL, and COX, Circuit Judges and MIDDLEBROOKS,[*] District Judge.

MIDDLEBROOKS, District Judge:

_____

[*] Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

This appeal is taken from an opinion and order by the District Court for the Northern District of Georgia preliminarily enjoining Defendant Ralph T. Hudgens (the "Commissioner"), in his official capacity as Georgia Insurance and Safety Fire Commissioner, from enforcing several provisions of the Georgia Code as preempted by Section 514 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1144(a).

Before getting into the merits of this case, it is helpful to understand the two general models that employers use to provide health care to their employees. One way is through an "insured" health benefit plan. In this situation, ACME Corporation might enter into a contract with an insurance company for a fixed cost to provide health benefits to ACME's employees.[1] The insurance company will process claims for health care payments, utilizing its own funds to pay claims covered by the health insurance plan. The insurance company – not ACME – will assume the entire risk in paying out health care claims.

Alternatively, ACME Corporation might provide its employees with "self-funded" or "self-insured" health benefit plans, in which case ACME would pay out any claims from its own funds.[2] Thus, in this model, it would be ACME Corporation – the employer – that endures the financial risk associated with being

---

[1] Employees often pay premiums to contribute to the price their employers pay to insurance companies.

[2] Similar to insured plans, the employee may share the cost through premiums deducted from their paycheck, and some employers might impose certain deductibles or co-payments.

responsible for paying health care charges incurred by its employees. Additionally, employers providing self-funded plans often contract with third-party administrators ("TPAs") to perform certain administrative functions for the employer and each plan.[3] A TPA's administrative duties might include processing claims, paying claims, and managing the everyday functioning of a plan.

This case deals with the latter-described health care model – "self-funded" health benefit plans – and the TPAs of self-funded plans. For the reasons set forth below, we affirm.

## I.    BACKGROUND

In May 2011, the State of Georgia enacted the Insurance Delivery Enhancement Act of 2011 ("IDEA"), which amends certain portions of Georgia's Insurance Code, including Georgia's "Prompt Pay" laws. These Prompt Pay laws had been in place since 1999 and required "insurers" to either pay a claim for benefits, or give notice of why a claim would not be paid, within fifteen working days after receipt of a claim. *See* O.C.G.A. § 33-24-59.5(b)(1) (2005). If an insurer did not comply with the Prompt Pay requirements, the insurer would have to pay annual interest of eighteen percent on the proceeds or benefits due under the terms of the plan. *See id.* § 33-24-59.5(c).

---

[3] As seen in this case, TPAs are often insurance companies acting solely in an administrative capacity.

3

Under the 1999 Prompt Pay statute, the statutory definition of "insurer" included "accident and sickness insurers," but expressly excluded entities that provide for the financing or delivery of health care services through a health benefit plan "subject to the exclusive jurisdiction of the federal Employee Retirement Income Security Act of 1974 [("ERISA")], 29 U.S.C. Section 1001, et seq." O.C.G.A. § 33-24-59.5(a)(3) (2005). Thus, the 1999 Prompt Pay statute applied to insured ERISA plans (where employers contract with insurance companies to provide health insurance), but not to self-funded ERISA plans (where the employer bears the ultimate risk).

In recent years, fewer and fewer of Georgia's health benefits payors have become subject to the Prompt Pay laws because of a rising trend amongst employers to provide self-funded plans to employees. In response to the abated impact the 1999 Prompt Pay laws have on health benefits payors, the Georgia General Assembly passed IDEA, and Georgia's Governor subsequently signed IDEA into law. Several sections of IDEA, if placed into effect, would extend the prompt-pay restrictions to self-funded health plans and their TPAs – something the original statute expressly excluded from its breadth – and impose additional timeliness restrictions and penalties.

## A.    Section 4

4

Section 4 of IDEA amends a section of the Georgia Code that governs the licensure of insurance "administrators." Section 4 does several things. First, it expands the definition of "administrator" to include business entities that provide claims processing services "on behalf of a single or multiple employer self-insurance health plan" – or TPAs. Second, it removes a provision that exempted from licensure a "business entity that acts solely as an administrator of one or more bona fide employee benefit plans established by an employer or an employee organization, or both, for whom the insurance laws of this state are preempted pursuant to [ERISA]." Third, Section 4 adds a new subsection providing that "administrators" (which now includes TPAs) are subject to the 1999 Prompt Pay statute, as amended, unless the self-insured health plan failed to fund the plan enough to allow the TPA to pay the claim.[4]

## B.    Section 5

Section 5 of IDEA amends the Prompt Pay statute as it relates to the timely payment of health benefits. This Section changes the substantive prompt-pay requirements by: (1) providing new deadlines for payment or notice – fifteen days for electronic claims and thirty days for paper claims for processing and paying (or denying) a claim; (2) reducing the interest rate on untimely payments from eighteen percent to twelve percent; and (3) adding a provision authorizing the

---

[4] Thus, for the most part, TPAs are subject to the Prompt Pay laws.

5

Commissioner to impose an "administrative penalty" on an insurer that fails to timely process at least ninety-five percent of its claims in a financial quarter. Section 5 charges the Commissioner with the duty to collect timeliness data and impose the aforementioned penalties.

Additionally, Section 5 changes certain statutory definitions in the Prompt Pay statute. It amends the definition of "health benefit plan" to specifically include a "self-insured plan." It also changes the Prompt Pay statute's definition of "insurer" in three ways. First, it deletes the express exemption for ERISA-regulated self-funded plans, which effectively includes an ERISA "self-insured health plan" in the definition of "insurer." Second, it adds "the plan administrator of any health plan" and "any other administrator as defined in . . . Code Section 33-23-100 [Section 4]" to the definition of "insurer." This modification brings TPAs for self-funded plans within the breadth of the Prompt Pay regulations. Third, Section 5 adds a new subsection that states: "This Code section shall be applicable when an insurer is adjudicating claims for its fully insured business or its business as a third-party administrator."

## C.    Section 6

Section 6 of IDEA creates a new section of the Georgia Code – Section 33-24-59.14 – that governs payments made by "administrators" and "insurers" to health care providers and facilities claiming benefits under health benefit plans.

6

Section 6's substantive requirements and penalties are identical to those set forth in Section 5. Section 6 expressly adopts Section 5's definitions of "benefits" and "health benefits plans." By cross-reference, Section 6 also provides the definition of "administrator" as defined in Section 4.

Section 6, however, provides a different definition for "insurer" from what is provided in Section 5. Unlike Section 5, Section 6's definition of "insurer" does not include "any self-insured health benefit plan" or "any other administrator as defined in paragraph (1) of subsection (a) of Code Section 33-23-100 [Section 4]"; however, Section 6's definition of insurer does include "an accident and sickness insurer . . . or any similar entity, which entity provides for the financing or delivery of any health plan." As noted above, "health benefit plan" under Section 6 includes self-insured plans.

On August 28, 2012, appellee America's Health Insurance Plans ("AHIP")[5] filed an action for declaratory judgment against the Commissioner, as the State official charged with enforcing IDEA. Specifically, AHIP's complaint seeks a declaration that Sections 4, 5, and 6 of IDEA, as applied to self-funded health plans and their administrators (or TPAs), are preempted by ERISA. On September 14,

---

[5] AHIP is a national trade association that represents companies that provide and administer employer health benefit plans. In reality, AHIP's members are health insurance companies acting as TPAs for self-funded employer health plans.

2012, AHIP moved to preliminarily enjoin the Commissioner from enforcing the challenged statutes.

On the eve of the amendments' effective date, which was scheduled for January 1, 2013, the district court granted AHIP's motion and preliminarily enjoined the Commissioner from enforcing Sections 4, 5, and 6 of IDEA on the ground that each was preempted by Section 514 of ERISA. *America's Health Ins. Plans v. Hudgens*, 915 F. Supp. 2d 1340 (N.D. Ga. 2012).[6] This interlocutory appeal followed, arguing largely that the district court erred by finding that the challenged IDEA provisions were preempted.

## II.    JURISDICTIONAL ISSUES

Before we can assess the district court's grant of a preliminary injunction, we must consider the issues about our jurisdiction. In a motion to dismiss, the Commissioner challenged the district court's jurisdiction. Specifically, and relevant to this appeal, the Commissioner argued that AHIP lacks standing to challenge the IDEA provisions, and that the Tax Injunction Act bars the suit. The district court found that AHIP did have standing to bring the suit and that the Tax Injunction Act did not preclude the action.

---

[6] The district court also denied the Commissioner's motion to dismiss, which argued, *inter alia*, that AHIP lacks standing and that the Tax Injunction Act, 28 U.S.C. § 1341, deprives the court of jurisdiction.

8

We review jurisdictional issues *de novo* and factual findings of jurisdictional facts for clear error. *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1085 (11th Cir. 2010) (citing *Amos v. Glynn Cnty. Bd. of Tax Assessors*, 347 F.3d 1249, 1255 (11th Cir. 2003)).

## A.    Standing

The Commissioner appeals the district court's determination of standing on two grounds. First, the Commissioner argues that AHIP failed to demonstrate injuries to AHIP or its members. Second, the Commissioner argues that the district court erred by not allowing the Commissioner to conduct discovery on the issue of AHIP's standing.

In order to have standing under Article III of the Constitution, AHIP has the burden of showing: "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (quotations omitted). The injury prong of standing is met when the injury is "imminent—not abstract, hypothetical, or conjectural," *Alabama-Tombigbee Rivers Coalition v. Norton*, 338 F.3d 1244, 1253 (11th Cir. 2003), or when application of the challenged statute is likely, or there is a credible threat of application. *See Ga. Latino Alliance for Human Rights v. Governor of*

9

*Ga.*, 691 F.3d 1250, 1257-58 (11th Cir. 2012).  An association, such as AHIP in this case, has standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977)).  The Commissioner only challenges whether AHIP made a sufficient showing of an injury in fact to one of its members, and we see no reason to disturb the district court's findings as to the second and third prongs of the *CAMP* analysis.

The district court found that when IDEA takes effect, "AHIP's members will be faced with the choice of complying with its requirements, which impose direct and indirect costs, or ignoring it, which will expose them to penalties imposed by the Commissioner." *AHIP*, 915 F. Supp. 2d at 1352.  The court also noted the Commissioner's public announcement of his intention to enforce the prompt-pay requirements of IDEA, and found that "application of the statute to AHIP's members 'is likely.'" *Id.* (quoting *Ga. Latino Alliance for Human Rights*, 691 F.3d at 1257-58).[7]  The Commissioner asserts that the district court erred in its finding

---

[7] In addition, the district court acknowledged that the parties did not dispute that the challenged

10

because the only evidence AHIP provided in support of its standing was the Declaration of Mary Beth Donahue, AHIP's Executive Vice President.

"[W]hen standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). Here, we find that the allegations in the Complaint and assertions in Ms. Donahue's declaration,[8] along with the Commissioner's stated intent to enforce the new prompt-pay statutes, were sufficient to support the district court's finding that injury to AHIP's members was imminent.

Further, we are not persuaded by the Commissioner's secondary argument – that the district court erred by granting the injunction without allowing the Commissioner an opportunity to conduct discovery on the issue of standing. The Commissioner did not serve any discovery on the issue of standing, nor did he ask the district court for an opportunity to conduct discovery in any of the underlying proceedings.

IDEA provisions apply to AHIP's members, and that AHIP alleged that its members already incurred costs and will incur future costs to meet the new prompt-pay requirements.

[8] The Commissioner cites to *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999), in support of his argument that AHIP did not establish standing. *Stincer* involved an affidavit submitted in support of an associational plaintiff's standing. The *Stincer* affidavit contained two paragraphs pertinent to the plaintiff's standing, but omitted any allegation that the plaintiff's constituents suffered a concrete injury in connection with the challenged state statute, or that a favorable decision would redress any purported injury. *Id*. at 887. We therefore found the *Stincer* affidavit to be insufficient to establish the plaintiff's associational standing. In the instant case, the Donahue declaration adequately sets forth that IDEA will cause specific harm or injury to AHIP's members as a result of enactment. Thus, *Stincer* is distinguishable.

11

Accordingly, we find that AHIP has standing to challenge Sections 4, 5, and 6 of IDEA.

### B.    The Tax Injunction Act

In his second jurisdictional attack, the Commissioner argues that AHIP's lawsuit is barred by the Tax Injunction Act.  The Tax Injunction Act prohibits district courts from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  This Act's "overarching purpose [is] to impede federal court interference with state tax systems . . . ."  *Miami Herald Publ'g Co. v. City of Hallandale*, 734 F.2d 666, 670 (11th Cir. 1984).

The Commissioner argues that the fees, fines, and assessments collected pursuant to IDEA should be considered "taxes" under the Tax Injunction Act. According to the Commissioner, any fees and fines (1) would "inure to the public at large and not merely defray the cost of regulation or benefit regulated entities," and (2) "can be contested [by a regulated party] via administrative hearing and by judicial review."  (Appellant Br. at 22).

The Commissioner's argument fails because IDEA is regulatory in nature; it is not intended to raise revenues. *See Miami Herald*, 734 F.2d at 670 ("to the extent the statute challenged is regulatory rather than revenue raising in purpose,

12

the measure does not constitute a tax, and the district court retains jurisdiction"). Here, it is apparent that the challenged provisions' primary purpose is to regulate the timeliness and manner of payment to health care providers. In fact, the Commissioner stated in his district court briefs that the purpose of IDEA is "to address the growing problem of [TPAs] of health benefit plans not paying medical claims in a timely manner."[9] Further, the fact that a regulatory agency (the Commissioner) is responsible for administering and collecting IDEA's statutory penalties weighs against a finding that IDEA's purpose is to raise revenue. *See Collins Holding Corp. v. Jasper Cnty.*, 123 F.3d 797, 800 (4th Cir. 1997) ("An assessment imposed directly by a legislature is more likely to be a tax than one imposed by an administrative agency."); *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n*, 967 F.2d 683, 685, 686 (1st Cir. 1992). Thus, any fees, fines, or assessments collected under IDEA cannot be said to be a "tax," and we therefore find that the Tax Injunction Act does not apply to bar this suit.

### III.    PRELIMINARY INJUNCTION

Having addressed the jurisdictional issues, we now turn our focus to the district court's entry of a preliminary injunction and, more specifically, whether the

---

[9] The Commissioner does not argue – nor can he – that IDEA's "purpose" is to raise revenue. Rather, he claims that the fees, fines, and assessments collected under IDEA are "taxes" under the Act, since they are subsequently contributed to Georgia's general fund. This position ignores two important components of IDEA: (1) these "taxes" (as defined by the Commissioner) are only imposed for noncompliance with the prompt-pay deadlines; and (2) the twelve-percent interest penalties imposed on claims paid after the prompt-pay deadlines are to be paid directly to the person or health care provider claiming payments.

13

district court correctly found that Sections 4, 5, and 6 of IDEA are preempted by ERISA.

The district court's grant of a preliminary injunction is reviewed for abuse of discretion. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1307 (11th Cir. 2010) (citing *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1216 (11th Cir. 2008)). Its findings of fact underlying the grant of an injunction are reviewed for clear error, and its conclusions of law are reviewed *de novo*. *Id.*

A district court may grant a preliminary injunction only if the moving party shows that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). This Court has acknowledged that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" for each prong of the analysis. *Id.* (alteration in original) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). The Commissioner challenges the district court's rulings on each of these elements, but

14

focuses on the first element and whether the district court properly found that

Sections 4, 5, and 6 of IDEA are preempted by ERISA.[10]

### A.    Likelihood of Success on the Merits

The United States Constitution gives Congress the power to preempt state

law, *see* U.S. Const. art. VI, cl. 2, and such power can be exhibited in several ways.

AHIP asserts two forms of preemption: express and conflict.  Express preemption

"arises when the text of a federal statute explicitly manifests Congress's intent to

displace state law."  *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir.

2012) (citing *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153,

1167 (11th Cir. 2008)).  Conflict preemption occurs in one of two ways: (1) "when

it is physically impossible to comply with both the federal and the state laws," or

(2) "when the state law stands as an obstacle to the objective of the federal law."

*Id.* (quotations omitted).

At the district court, AHIP argued that the challenged provisions were

expressly preempted under Section 514 of ERISA.  Alternatively, AHIP argued

that the challenged provisions were preempted by ERISA's civil enforcement

provisions and claims-processing regulations under traditional principles of

conflict preemption.  Because the district court concluded that the IDEA provisions

were "expressly" preempted by Section 514, it did not reach AHIP's alternative

---

[10] The district court found that AHIP was likely to succeed on the merits because, as a matter of law, ERISA preempts the challenged provisions of IDEA.

15

arguments for conflict preemption. As set forth below, we conclude that express preemption under Section 514 applies.[11]

In determining whether the district court erred, we turn to ERISA's express preemption provision, Section 514(a). Section 514 states that ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA] employee benefit plan." 29 U.S.C. § 1144(a). This broad statutory preemption is restricted by the "Saving Clause," which provides that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." *Id*. § 1144(b)(2)(A). The "Deemer Clause" then acts as an exception to the Saving Clause, providing that an ERISA employee benefit plan "shall [not] be deemed to be an insurance company or other insurer, . . . or to be engaged in the business of insurance . . . for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts." *Id*. § 1144(b)(2)(B).

Thus, in determining whether a challenged law is expressly preempted under Section 514 of ERISA, we first look to whether it "relates to" employee benefit plans. If it does not, the law is not preempted. If it does "relate to" employee benefit plans, we then turn to whether the law is "saved" by the Saving Clause. If saved, we must determine whether the Deemer Clause applies. If the Deemer

---

[11] Because Section 514 applies to preempt enforcement of Sections 4, 5, and 6 of IDEA, we need not address AHIP's arguments of traditional conflict preemption.

Clause applies, then the Saving Clause does not serve to protect the law from preemption.[12]  Accordingly, this Court's analysis begins with whether the challenged IDEA provisions "relate to" ERISA plans.

> 1)    *"Relates to"*

The first point to address is whether the IDEA provisions "relate to" self-funded employee benefit plans.  While ERISA's express preemption is "clearly expansive," the "relates to" requirement "cannot be taken 'to extend to the furthest stretch of its indeterminacy,' or else 'for all practical purposes pre-emption would never run its course.'" *Egelhoff v. Egelhoff*, 532 U.S. 141, 146, 121 S. Ct. 1322, 1327 (2001) (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S. Ct. 1671 (1995)).

The Supreme Court has found that a state law relates to an ERISA plan "if it has a connection with or reference to such plan," *id*. at 147 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S. Ct. 2890, 2900 (1983)), but "cautioned against an 'uncritical literalism' that would make pre-emption turn on 'infinite

---

[12] As quoted by the district court, the Supreme Court has described the workings of Section 514 as follows:

> If a state law "relate[s] to . . . employee benefit plan[s]," it is pre-empted. § 514(a). The saving clause excepts from the pre-emption clause laws that "regulat[e] insurance." § 514(b)(2)(A). The deemer clause makes clear that a state law that "purport[s] to regulate insurance" cannot deem an employee benefit plan to be an insurance company. § 514(b)(2)(B).

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S. Ct. 1549, 1552 (1987) (alterations in original).

connections.'"  *Id*. (quoting *Travelers*, 514 U.S. at 656, 115 S. Ct. at 1677).  "[T]o determine whether a state law has the forbidden connection, we look both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans."  *Id*. (quoting *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325, 117 S. Ct. 832, 838 (1997)).

In applying the relevant Supreme Court precedent, we agree with AHIP that Sections 4, 5, and 6 of IDEA impermissibly "relate to" ERISA plans.  Specifically, the challenged provisions would require self-funded ERISA plans to process and pay provider claims, or notify claimants of claim denials, within fifteen or thirty days, depending on whether the claim is submitted electronically or conventionally.  These timeliness requirements fly in the face of one of ERISA's main goals: to allow employers "to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits."  *Id*. (quoting *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 9, 107 S. Ct. 2211, 2216 (1987)).  If these provisions were to go into effect, employers offering self-funded health benefit plans would be faced with different timeliness obligations in different states, thereby frustrating Congress's intent.

18

The Commissioner argues that only those state statutes that regulate or conflict with *substantive* aspects or coverage determinations of ERISA plans have been found to "relate to" such plans. According to the Commissioner, IDEA's prompt-pay or notice requirements are *procedural*, and therefore cannot "relate to" ERISA plans. We are not persuaded by this argument. As the *Egelhoff* Court stated, "[o]ne of the principal goals of ERISA is to enable employers to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits." 532 U.S. at 148, 121 S. Ct. at 1328 (quotations omitted). The Commissioner's position runs contrary to this Supreme Court precedent. Additionally, as correctly noted by the district court, IDEA's requirements will not necessarily directly alter the coverage decision-making process, but they *will* compel certain action (prompt benefit determinations and payments) by plans and their administrators. The statutes will also impact the *amount* paid to beneficiaries in the case of late payment or notice.

Further, the Commissioner argues that there can be no "connection with" ERISA because IDEA's focus is on the regulation of non-fiduciary TPAs and medical providers, which he purports are not "ERISA entities." This argument holds no water, as we have held that ERISA's overarching purpose of uniform regulation of plan benefits overshadows this distinction. *See Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1180 (11th Cir. 2006). In *Jones*, we held that state law claims

against Defendant LMR International were preempted because the claims "clearly relate[d] to the [employee benefit] plan and [were] thus preempted." *Id.* Notably, however, the claims against defendant Lilli Thomas, an agent of LMR in administering the plan, were also held to be preempted, "even if she [was] not herself an ERISA entity." *Id.* Going even further, we noted the irrelevancy of whether one of the defendants was an "ERISA entity," stating that state law claims that would "affect relations among principal ERISA entities" give rise to preemption. *Id.*; *accord Morstein v. Nat'l Ins. Servs., Inc.*, 93 F.3d 715, 722 (11th Cir. 1996) ("when a state law claim brought against a non-ERISA entity does not affect relations among principal ERISA entities as such, then it is not preempted by ERISA").[13] Additionally, IDEA is not limited to TPAs, but rather applies to self-funded health plans without regard to the specific entity addressing the claim. Thus, our decision is not influenced by whether the IDEA provisions affect ERISA entities, or whether the TPAs are fiduciaries of the plan, since the enactment of IDEA would affect self-funded plans and the relations amongst principal ERISA entities.

2)    *The Saving and Deemer Clause*

---

[13] *Morstein* dealt with state law claims brought against an independent insurance agent accused of fraudulently inducing the plaintiff to change benefit plans. This Court held that state law claims against an independent insurance agent and his agency were not preempted by ERISA. In doing so, we explained that the agent and his agency "had no control over the payment of benefits or a determination of [the plaintiff's] rights under the plan." *Id.* at 723.

20

Having found that the challenged IDEA provisions "relate to" ERISA self-funded plans, we consider whether an exception applies, or whether an exception to the exception applies. The district court found that the challenged IDEA provisions fall within the Saving Clause, but that the Deemer Clause applies to prohibit Georgia's timeliness regulations.

As noted above, the Saving Clause exempts a state law from Section 514(a) preemption if the state law "regulates insurance." 29 U.S.C. § 1144(b)(2)(A). For the Saving Clause to apply, the state law must satisfy two requirements: (1) it "must be specifically directed toward entities engaged in insurance," and (2) it "must substantially affect the risk pooling arrangement between the insurer and the insured." *Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 341-42, 123 S. Ct. 1471, 1479 (2003). Applying this standard, the district court found that the Saving Clause applies to save the challenged IDEA provisions from preemption. Specifically, as to the second prong of the test, the district court found that the risk pooling arrangement between the insurer and the insured was substantially affected "because the Act . . . imposes a timeliness requirement onto the agreement between the insurer, or plan, and the insured, or beneficiary." *AHIP*, 915 F. Supp. 2d at 1361.

21

AHIP does not dispute that IDEA is "directed toward entities engaged in insurance"; rather, it focuses its argument on the second prong – whether the timeliness amendments "substantially affect the risk pooling arrangement."

While the Supreme Court has refined the analytical framework for determining when a state law regulates insurance, application here is less than certain. Justice Scalia, writing for a unanimous Court in *Miller*, offers some guidance. First, the Court explains that a state law merely "aimed at insurance companies" – like one that mandates the rate at which insurance companies must pay their janitors – does not fall under the Saving Clause because such a law does not substantially affect the risk pooling arrangement. *Miller*, 538 U.S. at 338, 123 S. Ct. at 1477. Second, the Court states that its test "requires only that the state law substantially *affect* the risk pooling arrangement between the insurer and insured; it does not require that the state law actually spread risk." *Id*. at 339 n.3 (emphasis in original). Third, the Court notes that the actual terms of the insurance policies need not be altered or controlled by the state law in order for the Saving Clause to apply; rather, "it suffices that [the state laws] affect the risk pooling arrangement between insurer and insured." *Id*. at 338. The Supreme Court also provides several examples in which state laws "regulate insurance" since they "alter the scope of permissible bargains between insurers and insureds." *Id*. at 338-39.

22

These examples include mandated-benefits laws (*Metropolitan Life*),[14] the notice-prejudice rule (*UNUM Life*),[15] and independent-review provisions (*Rush Prudential*).[16]

AHIP argues that the IDEA amendments do not alter the scope of permissible bargains under *Miller*. AHIP relies on the Fifth Circuit's decision in *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262 (5th Cir. 2004), for the notion that the IDEA provisions are remedial, and, therefore, do not affect the risk pooling arrangement.[17] The district court distinguished *Ellis* on the ground that "IDEA does not simply afford remedies for insurer 'bad faith' but imposes specific requirements on insurers and administrators in processing insureds' and beneficiaries' claims." *AHIP*, 915 F. Supp. 2d at 1361 n.28. The district court also noted that all health insurance policies must expressly include the terms of Georgia's timeliness provisions. *Id.* (citing O.C.G.A. § 33-29-3(b)(8) (2005)).

On the issue of whether the IDEA amendments affect risk pooling, we note that the mandated inclusion of IDEA's timeliness requirements in self-funded

---

[14] Mandated-benefits laws require a policy to cover certain risks mandated by statute.

[15] Notice-prejudice rules provide whether an insurer must cover claims submitted late.

[16] Independent-review laws require insurers to offer beneficiaries an independent review of certain health benefit denials.

[17] *Ellis* dealt with two Texas statutes that were "remedial in nature—they provide[d] remedies to which the insured may turn when injured by the bad faith of the insurer." *Id.* at 277 (internal quotation marks omitted). In finding the statutes to be "remedial," and applying the *Miller* test, the Fifth Circuit held that the challenged laws "cannot possibly affect the *bargain* that an insurer makes with its insured *ab initio*." *Id.* (emphasis in original). The statutes provided only that "the insured may recover additional damages if thereafter the insurer acts in bad faith or unfairly," notwithstanding the bargain that was struck between insurer and insured. *Id.*

policies is not dispositive. *Miller*, 538 U.S. at 338. Further, the timeliness requirements seem to be largely directed toward the needs of medical providers, and, as in *Ellis*, the challenged provisions appear to be remedial. Nor are Georgia's timeliness requirements identical to the notice-prejudice rules cited in *Miller*, since those rules "govern[ed] whether or not an insurance company must cover claims submitted late." *Id*. at 339 n.3. Nevertheless, we acknowledge the similarities between Georgia's prompt pay requirements, mandated-benefits laws, notice-prejudice rules, and independent review laws in that they all affect the rights and duties of the parties under the terms of a policy.

But we save this determination for another day, as we agree with the district court's application of the Deemer Clause, which exempts self-funded ERISA plans from state laws that "regulate insurance." *See FMC Corp.*, 498 U.S. at 64, 111 S. Ct. at 411 ("Our interpretation of the deemer clause makes clear that if a plan is insured, a State may regulate it indirectly through regulation of its insurer and its insurer's insurance contracts; if the plan is uninsured [or self-funded], the State may not regulate it.").[18] Sections 4, 5, and 6 of IDEA regulate the timeliness of benefit payments under *self-funded* ERISA plans, and it is apparent that the purpose and effect of IDEA is to extend Georgia's prompt pay laws to claims made

---

[18] We are not persuaded by the argument that the challenged IDEA provisions are not preempted to the extent that they only apply to TPAs, as this position ignores the fact that TPAs would be acting pursuant to the underlying self-funded ERISA plans. Whether direct or indirect, state insurance regulation of self-insured ERISA is not allowed by operation of the Deemer Clause.

24

under self-funded ERISA plans.  Thus, the Deemer Clause applies to preempt the challenged IDEA provisions.

For these reasons, the challenged IDEA provisions are preempted by ERISA Section 514.  Therefore, we do not disturb the district court's determination that AHIP is likely to succeed on the merits of its claim.

## B.    Equitable Factors

The Commissioner argues that the district court erred and abused its discretion in concluding that AHIP met its burden to show the final three preliminary injunction requirements.  The district court held that AHIP's members will suffer irreparable injury if Sections 4, 5, and 6 of IDEA were implemented, specifically finding that "[t]o comply with the law, AHIP's members will be required to incur the costs and burdens, including increased employee time, of modifying their claims processing systems, of monitoring compliance, and of preparing quarterly reports to Georgia regulators."  *AHIP*, 915 F. Supp. 2d at 1364.  The court, also noting the Commissioner's public announcement of his intent to enforce IDEA, found that "[a]bsent an injunction, AHIP's members will be forced either to incur the costs of compliance with a preempted state law or face the possibility of penalties."  *Id*.  The district court also concluded that "neither harm to the Commissioner nor the public interest weighs against a preliminary injunction."  *Id.*

25

Reviewing these issues, we find that the district court did not abuse its discretion in concluding that AHIP met its burden to show irreparable injury and that the balance of equities weighed in favor of a preliminary injunction.[19]

## IV.    CONCLUSION

The result of Sections 4, 5, and 6 of IDEA is an impermissible encroachment upon federal law.   When, as here, a state law relates to certain areas that Congress has explicitly determined are off limits, we must recognize that federal law prevails.   Based on the conclusions set forth above, we affirm the district court's order preliminarily enjoining enforcement of Sections 4, 5, and 6 of IDEA.

**AFFIRMED.**

---

[19] As to the latter, we have said that "[f]rustration of federal statutes and prerogatives are not in the public interest," and no harm arises from a state's nonenforcement of invalid legislation. *Alabama*, 691 F.3d at 1301.